(No. 5924.  April 26, 1933.)

JOSEPH DICKENS and MARTHA DICKENS, Husband and Wife, Appellants, v. NATHAN E. HESTON and CORA M. HESTON, Husband and Wife, Respondents.

[21 Pac. (2d) 905.]

Thomas E. Buckner and Charles F. Reddoch, for Appellants.

Cleve Groome, for Respondents.

BUDGE, C. J.—This is an action in ejectment. The record discloses the following facts: On December 22, 1924, respondents were the owners and in possession of eighty acres of land in Canyon county and on that date they executed and delivered to appellants their promissory note in the

principal sum of $10,000 due five years after date, bearing interest at six per cent per annum, and to secure the payment thereof executed and delivered to appellants a real estate mortgage covering the land in question. On December 26, 1929, the following transactions took place:

1. Respondents executed and delivered to appellant, Joseph Dickens, a warranty deed covering said land.

2. Appellants and respondent, Nathan E. Heston, executed a written contract whereby the former agreed to sell said land to the latter for $10,000, payable on or before three years after date, with interest at six per cent per annum, interest payable annually, and providing that the latter should pay all state, county and irrigation district taxes or assessments from and including the year 1929, and keep the buildings on the premises insured against fire and pay the premiums on such insurance policies. It was further provided that appellants should concurrently execute a warranty deed conveying the premises to respondents, subject to 1929 taxes and water assessments, and that such deed with copy of the contract and abstract of title should be deposited with First National Bank of Caldwell as escrow-holder, which was authorized to receive the payments to be made under the contract and to deliver the deed upon compliance therewith. Provision was also made for forfeiture and return to appellants of the deed, abstract of title and insurance policies, upon failure of respondent, Nathan E. Heston, to make the payments of principal, interest, taxes, water assessments and insurance premiums as specified in the contract, within ten days after written notice to him specifying such defaults.

3. Appellants executed a warranty deed to respondents covering said premises, subject to all state, county and irrigation district taxes and assessments for 1929.

4. Appellants executed a satisfaction of the mortgage dated December 22, 1924.

On the same day, December 26, 1929, the warranty deed from respondents to Joseph Dickens and the satisfaction of the mortgage were recorded at the request of Joseph Dickens, according to the indorsement thereon; and the war-

ranty deed from appellants to respondents, a copy of the contract and abstract of title to the land were deposited with the escrow-holder. Respondents continued in possession of the premises.

On January 4, 1932, written notice was served upon respondents, signed by Joseph Dickens, specifying the following defaults under the contract: nonpayment of interest; nonpayment and delinquency of state and county taxes and irrigation district assessments; and nonpayment of insurance premiums; and notifying respondents that if such defaults were not cured within ten days after service of notice the contract would be forfeited and the escrow-holder required to return to appellants the papers deposited in escrow. The defaults were not cured within the specified time and on January 20, 1932, appellants commenced this action to recover possession of the premises.

In the complaint appellants allege their ownership of said land since December 26, 1929; the execution of the contract and the provisions thereof; the deposit of the copy of the contract, the deed and abstract of title in escrow; the various defaults; the giving of the notice above referred to; and the failure of respondents to cure the defaults within the specified time. It is also alleged that appellants are entitled to possession of the premises, which respondents refuse to surrender; that appellants have duly performed the terms and conditions of the contract on their part; that $75 per month is the reasonable rental value of the premises; and that by reason of respondents' unlawful withholding thereof appellants have been deprived of its rental since January 16, 1932, and by the continuance thereof will be deprived of its use and occupation for the farming season of 1932 to their damage in the sum of $900. Appellants prayed judgment for the restitution of the premises, $75 damages for the value of the rents and profits, and $900 damages for wrongful withholding of possession.

By their answer, respondents deny generally the allegations of the complaint, allege they are rightfully in possession of the premises, and admit the execution of the instru-

ments described in the complaint. By way of affirmative answer respondents allege that on December 26, 1929, they were indebted to appellant, Joseph Dickens, on the note and mortgage dated December 22, 1924, in the sum of $10,000; that it was agreed between the parties that said note and mortgage should be extended and renewed for a term of three years at the same rate of interest, and that a new note and mortgage in the place of the old should be executed; that on December 26, 1929, the value of the real property and improvements was $16,000; that at the time of the execution of the contract a deed was given by respondents to appellant Joseph Dickens, which deed and contract were intended to be and constituted a mortgage; that respondents objected to the execution of the deed and contract, and the same were not executed on their part as their own voluntary act or of their own free will and accord, but were executed without additional or adequate consideration and by reason of oppressive threats of Joseph Dickens that he would foreclose the mortgage if they did not do so, and by reason of his representations that such was the method customarily and generally used for the extension and renewal of mortgages; that respondents are entitled to redemption rights, and have continuously remained in possession. Respondents prayed that the deed and contract be construed together and declared a mortgage, and not a contract for the sale and purchase of real property, and for general relief.

An answer to the affirmative defense, denying generally the allegations thereof, was filed by appellants.

Upon the issues thus framed, the cause was tried to the court, sitting without a jury, which made and filed its written findings of fact and conclusions of law, and entered judgment in favor of respondents, from which judgment this appeal is taken.

The substance of the first twenty-two assignments of error, which are not considered separately in appellants' brief, is that the following findings of fact, conclusions of law and recitals in the judgment are not justified or sustained by

the evidence, and as to the conclusions of law and judgment that they are also contrary to and against law, to wit: Appellants are not and have not been, since December 26, 1929, the owners in fee of the premises, but respondents are the owners thereof, subject to repayment by them to appellants of a debt in the sum of $10,000 secured by the deed and as stipulated in the contract; that appellants are not and respondents are entitled to possession of the premises; that the value of the property at the time of the execution of the deed and contract was $12,000 and far in excess of the indebtedness due from respondents to appellants; that the value of the rents and profits of said land is $800 per annum; that the deed and contract of sale should be construed together and were intended to be a mortgage given by respondents to secure the payment of said indebtedness; that the execution of said instruments was based upon a prior agreement between Joseph Dickens and respondents; that the former would extend and renew said mortgage for a period of three years; that respondents were compelled, against their will, involuntarily, oppressively and over their objection, by reason of the superior position of appellant Joseph Dickens, and his threats to foreclose the mortgage, and without additional or adequate consideration, to execute the deed and contract of sale, and upon Joseph Dickens' representations, believed and relied on by respondents, that the execution of the deed and contract was the customary and general method used for the extension and renewal of mortgages, and that that was the purpose of the deed and contract; that the contract was not for the sale or purchase of the premises, but specifies the terms and conditions of repayment of said indebtedness and it and the deed were given to secure the repayment thereof and extended the time of payment; that respondents have the same rights of redemption as in cases of mortgages generally.

Taking up first the finding of the court that the value of the rents and profits of the land was $800 per annum, the evidence upon this phase of the case varied from no cash rental value to $1,000 per year, presenting a sub-

stantial conflict, but sufficient competent evidence, if uncontradicted, to support the court's finding.

With respect to the finding and conclusion of the trial court that the value of the land in December, 1929, was $12,000 the testimony of various witnesses for appellants and respondents as to such value ranged from $16,000 to $10,000, and was substantially conflicting, but furnishing sufficient competent evidence, if uncontradicted, to justify the court's finding and conclusion.

The other matters presented by the assignments of error referred to present the sole question as to the sufficiency of the evidence to establish that the deed and contract, when considered together, were in fact a mortgage and not a contract of purchase and sale. The testimony as to the circumstances leading up to and surrounding the transactions of December 26, 1929, is substantially as follows: In November, 1929, Nathan E. Heston had a conversation with Joseph Dickens relative to the extension and renewal of the mortgage, at which time Dickens agreed to renew the mortgage for three years. Dickens, with respect to said conversation, testified there was no request for renewal or extension of the mortgage but that Heston wanted more time and he would not stand for it and Heston agreed to deed the property to him. A week before the mortgage became due Heston met Dickens and fixed a time to prepare and execute the papers. On December 21, 1929, the day before the mortgage became due, respondents met Dickens in Caldwell, but as the papers could not be prepared that day, the matter was postponed until December 26, 1929. Respondents met Dickens on that date and went to the office of the latter's attorney, where, according to Heston's testimony, which is substantially corroborated by that of his wife, the following took place:

" . . . . Mr. Dickens started the conversation something in this way—I believe he referred to Mr. Buckner by his given name—Tom, I want you to fix up a contract for my mortgage—now understand me, a contract for my mortgage—and that is the first time that I ever heard the word

contract mentioned in this proceeding was right there in Mr. Buckner's office—and I said, Hold on, Mr. Dickens, that is not the understanding I had at all that there was to be a contract, I talked to you about a mortgage and there never was nothing said about a contract. I said you are taking advantage of me, it is now four days after this mortgage is due and you are going right back on your word you gave me on the street in Caldwell that you would renew the mortgage, and there was an argument ensued and a good many things said.

"Q. What did Mr. Dickens say to that? A. Mr. Dickens says it is either a contract or nothing.

"Q. What did you say, do you remember? A. Well, after about five minutes of argument I submitted. I said, you got me where I suppose I will have to do anything you say.

"Q. Was that conversation heated? A. It was, yes, sir. It took me all unaware. I realized what a contract meant the minute he spoke of it. . . . .

"Q. What was said or done at that time, (after the papers were prepared), Mr. Heston? A. Well, after the contract was submitted to us that is about all there was to it. We just simply signed the contract.

"Q. That was the only thing left for you to do? A. That was the only thing left for us to do.

"Q. Was the mortgage due at that time? A. It was past due from the 21st to the 26th. This was the 26th now and the mortgage was actually due on the first day we was to meet here.

"Q. The first time you approached Mr. Dickens on this matter was somewhere along two months before the mortgage was due? A. Yes sir, and at least six days before because I wanted to find out what he was going to do. I had had a mortgage before and I took him at his word that he was going to give me another.

"Q. Was there anything said in that conversation, as you remember it, between you and Mr. Dickens, this last conversation on the 26th of December, relative to his saying,

that is the way they were fixing up extensions of mortgages? A. Yes sir, he made that statement, that is the way they were all doing it, and I think he repeated at that time the statement that it was either a contract or nothing at least twice or three times during that heated conversation.''

On cross-examination Heston testified:

''Q. You was having this talk now in the presence of Mr. Buckner? A. Yes sir, in the presence of Mr. Buckner.

''Q. Give us the conversation? A. That was the general conversation then. I accused him of going back on his word of three days before.

''Q. What did he say? A. He said it was either that or nothing; a few more things probably put in. We had a general argument right then and there.

''Q. What did he do? A. After a few minutes, why I submitted, after I told Mr. Dickens that he had taken advantage of me, this mortgage was past due four days right now and you haven't kept faith with me, you are taking advantage of me in this matter, you are forcing us.

''Q. What did he say? A. He kept repeating, as I studied a few minutes longer, he repeated that it was either a contract or nothing.

''Q. You told him that was all right, did you? A. No, I did not. I never said it was all right. I finally said, I submit; I said I suppose you got me where I got to.''

Heston also testified that he understood the nature of the transaction and the papers he was executing. His wife testified that she did not understand what she was doing and supposed the ''place would still be in our name'' and did not understand anything to the contrary until a year later when they received the tax statement.

On the other hand, Dickens testified that respondents examined the papers and signed them without a protest. Mr. Buckner, a witness for appellants and the attorney who prepared the instruments, testified respondents ''cheerfully signed'' the papers without objection. It is not contended and there is no evidence that any money passed in the transaction, but appellants take the position that the mortgage was satisfied and the note returned to respondents in

consideration of the execution of the deed. Heston denied that the note was ever returned to him, as did also Mrs. Heston. Witness Buckner testified that the note was delivered to respondents, and Dickens testified that Buckner "delivered him (Heston) all the papers." Heston's testimony that Dickens stated that the giving of a deed and contract to repurchase was "the way they were fixing up extensions of mortgages" stands uncontradicted.

From the foregoing and from other evidence that might be referred to, it is clear, with the exception of the matter last discussed, that the findings, conclusions and judgment complained of are based upon substantially conflicting evidence, but that the same are supported by sufficient competent evidence, if uncontradicted, to warrant this court in refusing to disturb such findings, conclusions and judgment. (*Pearson v. Frank,* 47 Ida. 115, 273 Pac. 6; *Olson v. Olson,* 47 Ida. 374, 276 Pac. 34; *Crockett v. Jones,* 47 Ida. 497, 277 Pac. 550; *Sorensen v. Larue,* 47 Ida. 772, 278 Pac. 1016; *Cornell v. Mason,* 46 Ida. 112, 268 Pac. 8; *Beam v. First Nat. Bank of Twin Falls,* 46 Ida. 286, 269 Pac. 84; *Hinckley v. Perkins,* 46 Ida. 574, 269 Pac. 101.)

█ In determining whether such instruments constitute a mortgage, we may consider the following circumstances, among others:

(a) *Existence of debt to be secured.* The controlling test to be applied in determining whether a given instrument is a mortgage is whether at the time of the execution of the deed the grantor sustains the relation of debtor to the grantee. (*Clinton v. Utah Construction Co.,* 40 Ida. 659, 682, 237 Pac. 427; *Investors' Mtg. Secur. Co. v. Hamilton,* 51 Ida. 113, 4 Pac. (2d) 347, 349; *Wright v. Rosebaugh,* 46 Ida. 526, 269 Pac. 98; *Root v. Wear,* 98 Kan. 234, 157 Pac. 1181; 41 C. J. 287, sec. 21.) The evidence is conclusive that at the time of the execution of the deed and contract respondents were indebted to appellants in the sum of $10,000, the principal sum due under the mortgage dated December 22, 1924.

■■ (b) *Satisfaction or survival of the debt.* On an issue as to whether a deed absolute in form was intended as an absolute conveyance or as a mortgage, the test is whether there was a subsisting debt after the conveyance. (*Clinton v. Utah Construction Co., supra; Holmes v. Warren,* 145 Cal. 457, 78 Pac. 954; 41 C. J. 335, sec. 99.)

"The fact that the grantee retains in his possession without cancellation the written evidence of a debt raises a strong presumption that a conveyance given did not extinguish the debt, and that a mortgage was intended. 27 Cyc. 1011; *Ennor v. Thompson,* 46 Ill. 214; *Wright v. Mahaffey,* 76 Iowa, 96, 40 N. W. 112; *McMillan v. Bissell,* 63 Mich. 66, 29 N. W. 737." (*Holman v. Mason City Auto Co.,* 186 Iowa, 704, 171 N. W. 12, 13.)

To the same effect see *Investors' Mtg. Secur. Co. v. Hamilton, supra.* It is clear that the identical indebtedness existing at the time of the execution of the deed and contract and the status of the parties remained the same and continued through the contract of sale. The satisfaction of the mortgage was executed by and recorded at the instance of Joseph Dickens, but there is a conflict in the evidence as to whether the note was surrendered, respondents testifying that the note was never delivered, thus raising a doubt and justifying the conclusion that the instruments were intended as a mortgage. (41 C. J. 337, sec. 99.)

■ (c) *Previous negotiations of parties.* It is said in 41 C. J. 337, sec. 100:

"On the question whether a deed absolute in form was intended as a mortgage, it is proper to consider the previous negotiations of the parties, their agreements and conversations and the course of dealings between them prior to and leading up to the deed in question."

Upon conflicting evidence the trial court found that Joseph Dickens agreed to a renewal and extension of the mortgage for three years upon the same terms and at the same rate of interest, and the evidence shows that respondents so understood until the meeting of the parties in Mr. Buckner's office on December 26, 1929.

(d) *Inadequacy of price.* The following rule is announced in 41 C. J. 337, sec. 101:

"When the question in issue is whether a deed of land, with an agreement for reconveyance, was made as an absolute conveyance of the property, or simply as a security for a debt or loan, in the nature of a mortgage, the value of the property at the time the deed was made is pertinent and material. For if it shall be shown that the consideration passing between the parties, or the amount to be paid by the grantor on exercising his right to repurchase, would be fairly proportioned to the value of the property, if considered as a debt or loan secured by a mortgage thereon, but grossly inadequate if regarded as the price of the land upon an absolute sale, this will tend strongly to show that a sale could not have been intended, but that the transaction should rather be treated as a mortgage. It is true inadequacy of price is not by itself alone enough to justify a finding that the deed was intended as a mortgage, contrary to the presumption arising from the face of the papers, but it is entitled to great weight when coupled with other circumstances, and especially when supported by proof that the grantor . . . . was under the pressure of debt and threatened with litigation . . . . or that he was in the power of the grantee, and that the latter took advantage of his necessity or exercised undue influence or imposition upon him."

The indebtedness was $10,000 and the court, upon conflicting evidence, found the value of the property at that time to be $12,000. While perhaps the purported cancelation of indebtedness of $10,000 in consideration for a tract of land valued at $12,000 may not be grossly inadequate, nevertheless, when considered with other circumstances herein discussed, particularly Joseph Dickens' superior position, his threats of foreclosure, together with respondents' financial condition, such disproportion in value tends to establish the transaction as a mortgage.

(e) *Financial condition of grantor.* It is said in 41 C. J. 288, sec. 24, that:

"If the grantor was severely pressed for money at the time of the transfer, so as not to be able to exercise a perfectly free choice as to the disposition of his property, and raised the sum needed by conveying his property in fee with a right of repurchase, his necessitous condition, especially in connection with the inadequacy of the price, will go far to show that a mortgage was intended."

In *Johansen v. Looney*, 31 Ida. 754, 761, 176 Pac. 778, 780, this court said:

"Notwithstanding some apparent conflict in the above authorities, the holding is general that the transaction must be fairly made for a consideration not grossly inadequate, and that any fraudulent or oppressive conduct on the part of the mortgagee is sufficient to annul the absolute character of the transfer. (*Alexander v. Rodriguez* (12 Wall. 323, 20 L. ed. 406), *Gassert v. Strong,* (38 Mont. 18, 98 Pac. 497), *Stoutz v. Rouse,* (84 Ala. 309, 4 So. 170), *Russell v. Southard,* (12 How. 139, 13 L. ed. 927), *Bradbury v. Davenport,* (114 Cal. 593, 46 Pac. 1062, 55 Am. St. 92), *Fort v. Colby,* (165 Iowa, 95, 144 N. W. 393), and *Liskey v. Snyder,* (56 W. Va. 610, 49 S. E. 515), *supra; Keeline v. Clark,* (132 Iowa, 360, 106 N. W. 257.)"

The following pertinent statement is made in *Alexander v. Rodriguez,* 12 Wall. 323, 339, 20 L. ed. 406, 411:

"The law upon the subject of the right to redeem where the mortgagor has conveyed to the mortgagee the equity of redemption, is well settled. It is characterized by a jealous and salutary policy. Principles almost as stern are applied as those which govern where a sale by a *cestui qui trust* to his trustee is drawn in question. To give validity to such a sale by a mortgagor it must be shown that the conduct of the mortgagee was, in all things, fair and frank, and that he paid for the property what it was worth. He must hold out no delusive hopes; he must exercise no undue influence; he must take no advantage of the fears or poverty of the other party. Any indirection or obliquity of conduct is fatal to his title. Every doubt will be resolved against him. Where confidential relations and the means of oppression

exist, the scrutiny is severer than in cases of a different character. The form of the instruments employed is immaterial. That the mortgagor knowingly surrendered and never intended to reclaim is of no consequence. If there is vice in the transaction, the law, while it will secure to the mortgagee his debt, with interest, will compel him to give back that which he has taken with unclean hands. Public policy, sound morals, and the protection due to those whose property is thus involved, require that such should be the law.''

It cannot be successfuly contended, in the light of the record before us, that Heston acted as a free man. He was in a situation, being without funds, where he was compelled, as expressed in the language of Dickens, to enter into the contract in question and make an absolute conveyance of his property, or nothing.

(f) *Intention of parties.*

" . . . . 'a conveyance of the mortgaged premises by the mortgagor to the mortgagee operates as a bar to the equity of redemption only when it clearly and unequivocally appears that both parties so intended that it should; otherwise it will be regarded as a mere change in the form of the security. *Ennor v. Thompson,* 46 Ill. 214' (*Bradbury v. Davenport,* 114 Cal. 593, 55 Am. St. 92, 46 Pac. 1062.)'' (*Investors' Mtg. Secur. Co. v. Hamilton, supra.*)

We are convinced, even in the face of the recitals in the documents, that there was no mutual intention of the parties that the deed was an absolute conveyance, but that it and the contract were in fact intended as security for the payment of the existing indebtedness.

When all of the facts and circumstances disclosed by the record are taken into consideration, we are satisfied that the trial court was correct in holding that the deed and contract should be construed togther as one transaction, and not as separate and distinct transactions, and when so construed, that they constituted a mortgage (*Kelley v. Leachman,* 3 Ida. 392, 29 Pac. 849; *Wilson v. Thompson,* 4 Ida. 678, 43 Pac. 557; *Largilliere v. Zavala,* 39 Ida. 759, 230 Pac. 774;

*Pritchard v. Butler,* 4 Ida. 518, 43 Pac. 73; I. C. A., secs. 44–804, 44–805), and that the evidence so establishing is clear, convincing and satisfactory. (*Bergen v. Johnson,* 21 Ida. 619, 123 Pac. 484; *Shaner v. Rathdrum State Bank,* 29 Ida. 576, 161 Pac. 90; *Clinton v. Utah Construction Co., supra; Investors' Mtg. Secur. Co. v. Hamilton, supra.*)

Appellants are not deprived of their right to recover their indebtedness nor of their lien securing the same. Their remedy, however, is not in ejectment. (*Kelley v. Leachman, supra; Brown v. Bryan,* 5 Ida. 145, 51 Pac. 995; *Meeker v. Shuster,* 5 Cal. Unrep. 578, 47 Pac. 580; Bancroft's Code Practice, vol. 6, sec. 5191, p. 6767; I. C. A., secs. 9–101, 9–104.)

By their twenty-third assignment of error appellants contend that the affirmative defense of respondents does not state facts sufficient to constitute a cause of action or entitle them to any relief, and in support thereof relies upon the rule announced in *Shaner v. Rathdrum State Bank, supra,* to the effect that where it is claimed that a deed, absolute on its face, is a mortgage, the claimant ought not to recover without tendering the amount of the debt. No tender is alleged in the affirmative defense. There is at least one important distinguishing feature, in addition to an entirely different state of facts, between the cited case and the case at bar, which makes the above rule inapplicable here. In the Shaner case, plaintiff, by the terms of the contract to repurchase, was required to pay the purchase price within one year and failed to do so. Here, the contract of sale required payment to be made on or before three years from December 26, 1929, and the contract was declared forfeited and this action commenced in January, 1932, before the purchase price became due. In *Bradbury v. Davenport,* 114 Cal. 593, 46 Pac. 1062, 55 Am. St. 92, it is said:

"Nor is it true that the debtor who has given a deed absolute in form, as security for the payment of his debt, must, under all circumstances, tender payment before he can litigate the character of the instrument; as, for example, where the debt is not due, and the grantee asserts an abso-

lute title, or is attempting to sell and convey to a stranger. A court of equity will not tie its hands by an unbending rule, which would require it to impose inequitable terms, or do any injustice in a given case falling within a general class, though having peculiar or distinguishing features."

See, also, *Reitze v. Humphreys*, 53 Colo. 177, 125 Pac. 518.

Judgment affirmed. Costs awarded to respondents.

Givens, Morgan, Holden and Wernette, JJ., concur.